**SO ORDERED.**

**SIGNED this 15 day of May, 2007.**



_____
JANICE MILLER KARLIN
UNITED STATES BANKRUPTCY JUDGE

_____

### IN THE UNITED STATES BANKRUPTCY COURT
### FOR THE DISTRICT OF KANSAS

| | | |
|---|---|---|
| In re, | ) | |
| HAROLD GEORGE POHL and | ) | |
| ALICE MAY POHL, | ) | Case No. 06-41236 |
| | ) | Chapter 13 |
| Debtors. | ) | |
| | ) | |

### MEMORANDUM AND OPINION

The Court must decide whether it can confirm a Chapter 13 plan when Debtors have zero disposable income, as that income is determined in accordance with 11 U.S.C. § 1325(b)(2), and whether it can confirm a Chapter 13 plan that runs less than three years. For the reasons stated below, the Court answers these questions "yes" and "no," respectively.

The Court has jurisdiction to decide these issues pursuant to 28 U.S.C. 157(b)(1) and §§ 1334(a) and (b). Confirmation of a plan is a core proceeding that this Court may hear and determine pursuant to 28 U.S.C. § 157(b)(2)(L).

**I.      Facts**

Debtors filed this case on December 4, 2006.[1] Their only income as of the date of filing, and for the six months prior to filing, was Harold's receipt of $776 and Alice's receipt of $562, respectively, in monthly social security benefits. Annualized, their total monthly benefit of $1,338 equals $16,056.

Fed. Rule Bankr. P. 1007(b)(6)[2] requires all debtors to complete the top half of Form B22C (the portion dealing with income) so it can be determined whether their family income is above, or below, the median income for persons in the debtors' state of the same household size.[3] Debtors' Form B22C indicates that their income is zero, because social security income is expressly excluded from the calculation pursuant to the definition of current monthly income (CMI) contained in § 101(10A)(B).

Chapter 13 debtors are also required to complete Form 6I, Schedules I and J, which was modified in October 2006 after enactment of BAPCPA. On Schedule I, Debtors listed

---

[1]Because this case was filed after October 17, 2005, when most provisions of the Bankruptcy Abuse Prevention and Consumer Protection Act of 2005 (BAPCPA) became effective, all statutory references are thus to the Bankruptcy Code, 11 U.S.C. §§ 101-1532 (West 2004 & Supp. 2006). All references to the Federal Rules of Bankruptcy Procedure are to the current Fed. R. Bankr. P., unless otherwise specified.

[2]Interim Fed. R. Bank. P. 1007(b)(6) provides:
(6) A debtor in a Chapter 13 case shall file a statement of current monthly income, prepared as prescribed by the appropriate Official Form ...

The Interim Rules have been approved and recommended by the Standing Committee on Rules of Practice and Procedure of the Judicial Conference of the United States, and have been adopted by the United States Bankruptcy Court for the District of Kansas by Standing Order No. 05-5, dated October 17, 2005.

[3]The application of "median family income" is made through § 707(b)(7). Median family income is relevant in a Chapter 13 proceeding through § 1325(b)(3), which uses the state's median family income as a deciding factor to determine whether a debtor's reasonable monthly expenses must be determined in accordance with § 707(b)(2) for above median debtors, or whether the reasonable monthly expenses must be determined based upon the debtor's actual expenses found on Schedule J for below median debtors.

2

their social security income of $1,338 on the line expressly designated for "Social security or other government assistance," Line 11. Since that is all their income, the same amount also appeared at line 16, which is entitled "Combined Average Monthly Income."

On the expense side of the equation, Debtors were not required to, and did not, complete Part IV and Part V of Form B22C, because that form (in compliance with Fed. R. Bankr. P. 1007(b)(6)) instructs that those parts need not be completed by debtors whose income falls below the state median. Instead, they completed Schedule J, Current Expenditures of Individual Debtor(s); it instructs debtors to "Complete this schedule by estimating the average or projected monthly expenses of the debtor and the debtor's family at time case."

Debtors' Schedule J shows rather meager average monthly expenses of $1,185. The itemized expenses, for example, reflect no expense for electricity, heating fuel, water, sewer, or home maintenance, and only $267 each month for housing.[4] The Trustee does not dispute, and the Court finds, that the expenses listed on Schedule J are reasonably necessary for Debtors' maintenance and support.

A comparison of Debtors' Schedules I and J reflects that when their expenses are deducted from their social security income, $153 remains available for a plan payment. Debtors' plan then proposes to pay $100 per month for 20 months, which will provide no dividend to unsecured creditors, to whom Debtors claim they owe $16,742. Their schedules

---

[4]Debtors are surrendering real property located in Missouri that appears to have little, if any equity, for the estate. Schedule A shows no other real estate, and Schedule G show no leases, so the Court is unsure by what arrangement Debtors reside at their stated address in Burlingame, Kansas.

reflect no secured or priority debt. The plan thus provides to pay only Debtors' attorney fees ($1,800), credit counseling fees ($125) and the Chapter 13 Trustee's statutory fees, which this Court refers to as a "fee only" case.

The Trustee filed an objection to confirmation[5] solely on the basis that the plan fails to extend at least 36 months or, alternatively, to pay all unsecured creditors in full, as he claims is required under 11 U.S.C. § 1325(b)(4). Debtors' position is that because they have zero disposable income on Form B22C, and $1,185 in expenses, they in fact have "negative" disposable income for confirmation purposes, and thus nothing needs to be paid to unsecured creditors under § 1325(b)(2). Debtors argue that the phrase "applicable commitment period" referred to in § 1325(b)(4)(A) is a multiplier that requires only a certain monetary amount or dividend to unsecured creditors, rather than a temporal requirement demanding that payments extend over a minimum number of months. They complete their argument by claiming that because "[n]o purpose would be served by extending the plan for another 16 months with $0.00 being paid to unsecured creditors during that time frame," as no additional income would be generated for creditors, their 22 month plan is confirmable.

## II. Analysis

### A. The relevant law

As always, the Court must begin with the language of the statute, itself. If the language is plain and unambiguous, the Court must generally enforce it according to its

---

[5]Doc. 15.

4

terms, giving each word its common usage.[6] The Court may not confirm a Chapter 13 plan unless the conditions of §§ 1325(b)(1)(A) or (B) are satisfied. Those subsections provide:

> (b)(1) If the trustee or the holder of an allowed unsecured claim objects to the confirmation of the plan, then the court may not approve the plan unless, as of the effective date of the plan -
>
> (A) the value of the property to be distributed under the plan on account of such claim is not less than the amount of such claim; or
>
> (B) the plan provides that all of the debtor's **projected** disposable income **to be received** in the **applicable commitment period** beginning on the date that the first payment is due under the plan will be applied to make payments to unsecured creditors under the plan.[7]

Clearly this plan does not provide to pay all claims in full, so the Court must determine if the plan complies with subsection (B). To assist the Court in applying the law to the facts, the statute defines three important terms critical to the proper interpretation of § 1325(b)(1)(B): "disposable income," "applicable commitment period," and "current monthly income."

Pursuant to § 1325(b)(2), disposable income is calculated by deducting the "amounts reasonably necessary" for the maintenance or support of the debtor or the debtor's dependents from a debtor's "current monthly income." "Amounts reasonably necessary" to support a debtor, i.e., expenses, are determined in two ways under BAPCPA, depending on whether the debtor's income is above or below the median for the state. For these clearly below-

---

[6] *United States v. Ron Pair Enterprises, Inc.,* 489 U.S. 235, 241 (1989); *Pioneer Investment Svcs. Co. v. Brunswick Assoc. Ltd. P'ship*, 507 U.S. 380, 388 (1993).

[7] Emphasis added to show the "forward-looking" tenor of the language.

5

median Debtors, those amounts are found in Official Form 6I, Schedule J, since debtors are not required to complete anything below Line 23 of Form B22C.

"Applicable commitment period" is defined in §1325(b)(4), as follows:

(4) For purposes of this subsection, the 'applicable commitment period'-
(A) subject to subparagraph (B), shall be -
    (I) 3 years; or
    (ii) not less than 5 years, if the current monthly income of the debtor and the debtor's spouse combined, when multiplied by 12, is not less than- [applicable median income for the appropriate family size]; and

(B) may be less than 3 or 5 years, whichever is applicable under subparagraph (A), but only if the plan provides for payment in full of all allowed unsecured claims over a shorter period.

Again, since Debtors' plan does not propose to pay unsecured creditors in full, subsection (A) is the pertinent subsection.

Finally, "current monthly income" (CMI) is defined in § 101(10A) as "the average monthly income from all sources" that the debtor received during the 6-month period prior to the commencement of the case. Section 101(10A)(B) then specifically excludes benefits received under the Social Security Act in calculating CMI.

### B. Applicable Commitment Period

Prior to enactment of BAPCPA, a debtor was required to devote all of his disposable income to the plan for at least three years. That 3-year fixed commitment period previously required by pre-BAPCPA § 1325(b)(1)(B) has been superseded with the "applicable commitment period" requirement defined in § 1325(b)(4). This new section could not be

6

Case 06-41236   Doc# 33   Filed 05/15/07   Page 6 of 11

more clear, and I agree with my colleagues, Judge Somers, in *In re Daniels,*[8] and Judge Berger, in *In re Beckerle*[9] and *In re Anderson*,[10] on this point.[11]  If a below-median income debtor cannot pay his unsecured debts in full, his applicable commitment period is three years.[12]  The applicable commitment period for above-median debtors is five years.[13]

As noted by many others who have come before me in interpreting § 1325(b)(4), first and foremost, the language supports a temporal interpretation of the term "applicable commitment period."[14] The pertinent subsections use words with a temporal meaning, such as "period," "commitment" and "years," and don't use words such as "when multiplied by 12," as is used earlier in the same statute, or "multiplied by 60," as used in § 707(b)(2)(A)(I). Congress clearly knows how to use a multiplier when it so intends, and chose not to do so in § 1325(b)(4).

Second, a "monetary" or "multiplier" interpretation of ACP is a significant departure from the pre-BAPCPA practice requiring a minimum period of payments that is simply not

---

[8]359 B.R. 320 (Bankr. D. Kan. 2006) (holding that "Because Debtor has below-median income, the Code requires that she commit her projected disposable income to the payment of unsecured creditors for a three year period, unless her unsecured creditors are paid in full prior to the end of such period.")

[9]2007 WL 1111264 (Bankr. D. Kan. 2007).

[10]___ B.R. ___, 2007 WL 1112925 (Bankr. D. Kan. 2007).

[11]*See also In re Schanuth*, 342 B.R. 601, 607 (Bankr. W.D. Mo. 2006); *cf. In re Dew*, 344 BR 655 (Bankr N.D. Ala. 2006).

[12]Section 1325(b)(2).

[13]Section 1325(b)(3).  *See also In re Lanning*, Case No. 06-41037, wherein this Court has recently decided this same issue, along with other issues, for above-median income debtors.

[14]*See In re Slusher*, 359 B.R. 290 (Bankr. D. Nev. 2007) (and cases cited therein).

7

justified by the language or structure of the statute, or by the admittedly scant legislative history.[15] BAPCPA's revision of § 1325 has not changed this tenet of pre-BAPCPA practice.[16] Third, adoption of the "monetary" or "multiplier" theory would allow debtors to cash out unsecured creditors at a discount at any time, without requiring a debtor make his or her best efforts over some required period of time to repay creditors.

Fourth, a holding that a "monetary" or "multiplier" theory is the correct view would be inconsistent with the Code's future reporting requirements for debtors, such as the obligation to turnover post-confirmation tax returns to the Trustee and to project reasonably anticipated income increases in the 12 months following filing. There would be no need to engage in such endeavors if regardless of the information gleaned, debtors could exit their Chapter 13 plan whenever they could pay off secured and priority claims.

Finally, what limited legislative history we have supports an interpretation consistent with the proposition that Congress believed that requiring debtors to make plan payments for 36-60 months would assist debtors in acquiring the financial discipline they would need to obtain a realistic fresh start, post-discharge. Senator Sessions, one of the sponsors of the legislation, stated that

> "[i]f a debtor files under Chapter 13 and learns how to manage money under a structured repayment plan that requires some discipline, the debtor learns financial responsibility and should be able to avoid future financial turmoil. Chapter 13 bankruptcies allow debtors to keep their assets and pay back a portion of their debts

---

[15]*In re Schanuth,* 342 B.R. 601 (Bankr. W.D. Mo. 2006), *citing* House Report, which indicates even the title of the report referenced Chapter 13 plans having a five-year duration in certain cases.

[16]*In re Davis*, 348 B.R. at 455-56 and *In re Schanuth*, 342 B.R. at 607.

8

over a 5 year period. In exchange, the remaining portions of their debt are discharged and the debtor gets a fresh start."[17]

Accordingly, it is not futile, as Debtors argue, to require a monthly payment each month for 36 months.

**C. Feasibility**

Although the Trustee has not directly raised the issue,[18] this decision on the mandatory length of Chapter 13 plans post-BAPCPA begs the question how debtors with zero CMI, such as these Debtors because of the statutory exclusion of their only source of income–from social security—could ever propound a feasible plan if the Court does not at some point take into account the reality of their budget going forward. The same would be true for the other classes of potential debtors whose sole income is derived from the other kinds of income expressly excluded by §101(10A), § 707(b)(2)(B), or § 1325(b)(2), including those with income received as a result of being a war crime victim or with income received as a result of being a victim of crimes against humanity or international terrorism, or from child support, foster care payments, or the like.

If the Court was bound to use the statutorily defined "CMI," without looking behind the type of income being received, for debtors whose sole, or majority, of income was

---

[17]151 Cong. Rec. S2462-02 at S2472 -S2473, 2005 WL 562943 (March 10, 2005) (statement of Senator Sessions).

[18]*See In re Schanuth*, 342 B.R. at 605 n.10 ("Although the Trustee did not specifically object to the feasibility of the Debtors' plan, the Court properly reaches that issue *sua sponte*. *See In re Ives*, 289 B.R. 726, 728-29 (Bankr. D. Ariz. 2003) (holding that the court has the responsibility to ensure plan compliance with the Bankruptcy Code even in the absence of an objection); *In re Miller,* 247 B.R. 795, 796-98 (Bankr. W.D. Mo. 2000)").

9

derived from social security or from war crime reparations or the like, those classes of potential Chapter 13 debtors could by definition never propose a feasible Chapter 13 plan. The Court finds nothing in the statute or the scant legislative history of BAPCPA to suggest that Congress intended for these persons to be effectively precluded from proceeding under Chapter 13. Conversely, it seems intuitive that Congress' express decision to exclude their income from the calculation of CMI demonstrates its sympathy for potential debtors who face the negative economic consequences likely to be associated with each exclusion.

This Court finds that debtors with zero "CMI" (or a negative CMI in the case of some above-median income debtors) can voluntarily agree to devote part or all of their actual income, reported on Schedule I, as income they "project" to receive during the lifetime of the proposed Chapter 13 plan, to fund a plan. Accordingly, this Court will not decline to confirm a debtor's plan, such as these Debtors' plan, on the basis that it is inherently infeasible if one exclusively relies on BAPCPA definitions of income. And although this Court could not force these Debtors to use their excludable income (social security) to fund a plan, if they elect to get the benefits and protections afforded by a Chapter 13 bankruptcy proceeding, they must agree to devote to a Chapter 13 plan their excess disposable income for the minimum time now required by BAPCPA, which is 36 months.

### III. Conclusion

Debtors' plan cannot be confirmed because it proposes a plan length of less than 36 months, in violation of 11 U.S.C. § 1325(b)(4). The Court, therefore, sustains the Trustee's objection, but will allow Debtors 30 days (from April 26, 2007, when this basic holding was

orally announced on the docket) to file and provide notice of an amended plan that is consistent with this opinion.  Alternatively, if Debtors elect to notify the Trustee and the Court that they will allow the standard confirmation order to reflect that the plan will run at least 36 months, also by May 26, 2007, they will not be required to file and provide notice of an amended plan.

This decision constitutes the Court's findings of fact and conclusions of law for purposes of Bankruptcy Rule 7052.  A separate order sustaining the Trustee's objection will be entered pursuant to Fed. R. Bank. P. 9021.

# # #